Welcome. May it please the Court, my name is Brock Specht. I'm appearing on behalf of the plaintiff's appellants, Rachel Winsor and Nicole Beischle. As you mentioned, Your Honor, the Department of Labor, we've ceded three minutes of our time to them. I also intend to reserve two minutes for rebuttal. Ms. Winsor and Ms. Beischle, my clients, contributed money into a trust fund that was supposed to be used for their exclusive benefit. We allege in the amended complaint that a portion of these funds were misappropriated by the defendants in breach of the trust, and we sued in order to recover the misappropriated money as participants are empowered to do under ERISA. The fact that my clients paid money into the trust fund out of pocket, and that a portion of that money was diverted by the defendants in breach of the trust, is sufficient to give my clients standing to sue to recover that money. The District Court's conclusion, to the contrary, should be reversed. Your Honors, given my limited time, I'd like to begin with this Court's opinion in the Glanton case, because I think the Glanton case, when you closely read the allegations that were in front of the Court, the decision of the Court, and the authorities that the Court relied on in that case, it very helpfully illustrates why we have standing here. In Glanton, as I'm sure the Court is aware, the allegations in that case involved a pharmacy benefits program, in which a third party was contracted to administer the program by purchasing drugs and then seeking reimbursement from the plant. And the key point, or the key distinction between the Glanton case and this case, is the fact that in Glanton, the money that was actually alleged to have been misappropriated was money that was paid by the employers. There was not a combination of employee and employee funds at issue with regard to what Glanton calls the spread. This Court, in its opinion in Glanton, explained that the defendant in that case, the administrator, Advanced PCS, pays for drugs with plant assets after accounting for co-payments that the participants make. So in Glanton, the participants contributed to the cost of the drugs through point-of-sale co-payments. There was not a trust fund in which funds from the employees and the employers were pooled into. Instead, claims were paid out of the employers' general assets. Is Glanton a case about injury in fact, or redressability? The Glanton opinion doesn't sharply distinguish between those two factors. I think Glanton was intended to say that in the circumstances before the Court, both were lacking. Both were lacking because the alleged misconduct, the keeping of the spread, was an injury that went to the employer, and also was a remedy that would go to the employer. So what is the injury in fact that you're claiming here? The injury in this case is the misappropriation of the funds that the trust agreement, the purpose of providing benefits to the employees. The injury is essentially an equitable interest in the money that you paid into the trust? I think it's an out-of-pocket financial injury. I, as a participant, am paying money into this program, and the recipient of the money, the trustee is saying, is bound to use that money only for the purpose of providing the benefits. Siphoning off a portion of that money and putting it in their pocket is a financial injury to me in that circumstance. Although you, is there any dispute or allegation that your clients didn't get the benefits they had signed up for? Yes. I would say that's exactly what we're saying. The program agreement says, you will pay this money, and the money will be used to provide you with benefits. It wasn't. A portion of it was retained by the defendants. So they're not getting it. If you want to think about it as a contractual arrangement or a benefit of the bargain analysis, the participants in this case are not getting the benefit of the bargain. They are entitled to have every dime that they contribute to that trust used to provide benefits to them. I mean, you're using benefits in a bit of a broader sense. I guess I was thinking of it somewhat more narrowly to the health benefits and other types of benefits that they signed up for. Those they did get. They did, but the agreement here and the obligation of the trustee is broader than that. It's just not to go out and purchase an insurance policy. It's to use the money that's being contributed into this trust for the exclusive purpose of providing benefits, not to put it to line your own pockets. They're under that obligation under their own agreement that they drafted that governs the operation of this program. In your view, the employer is an ERISA fiduciary. Absolutely. And, okay. How, since it is, there's no contract that says we will pay this much and you will pay that. Actually, there is. But it's not specific. It has to be like, we pay, have to pay 75 percent and you have to pay 25 percent. And that's the minimum, but after that we can, we can decide how much, right? What keeps them from saying, okay, you pay, we're not bound, you pay a little more? So I think I'm following you, Judge Rustani. The 75 percent that you're talking about Is a minimum. That's what the deal's going to be. Correct. And the question is, the employer can just decide, okay, you know, we're only going to pay, we're going to pay 80 percent. We've been paying 90 percent, but now we're only going to pay 80 percent. There's nothing in the contract that stops them from doing that. The employer, in this case, decided that they were going to pay, depending on the coverage, 80 to 90 percent with the employees paying the remainder. The employees pay that money into the trust. The funds are misappropriated. When the money comes back, as it should in this case then, the key point here is that But you're calling the misappropriation the commissions that went, or kickback, whatever you want to call it, that went back. And you said, and you think, okay, that amount should go back in the pool, but there's nothing that forces anybody to pay that, there's no contract  The employer receiving that money back is under a fiduciary obligation under ERISA to use the money to the extent it's attributable to participant contributions for the benefit of the participants. ERISA's anti-annealment provisions say they can't just keep that money for themselves. That's the important distinction that Glanton makes. I guess that's where you run up against Thole, because just because there is a breach of Right. I think Thole is more focused on injury rather than redressability, Your Honor. But what Thole says is where the only obligation of the defendant is defined in a certain way, and they have fulfilled that obligation, even if there is some breach of generalized allegation about a breach of trust, you haven't been injured. You don't have a stake in this lawsuit. How is this case different? That was a defined pension plan. Okay. You're getting your pensions. The thing was no longer seriously underfunded, so there's no harm. So how is that case different? They got their health benefits. They didn't get the entire benefit of what they were entitled to, unlike Thole, where they undisputably, the plaintiffs in that case, undisputably did get the benefits they were entitled to. Here, the language of the agreement is different. The structure of the plan is different. The plaintiffs are entitled to have every dime of the money that they are contributing money out of their pocket, and that's what they get in exchange. In Thole, there was no money coming out of the plaintiff's pocket. The employer was funding the pension plan, and there was no risk that the employees were not going to get what they were entitled to. This case is fundamentally different from Thole, and that's why injury is established. Except that if you got to do something for the plaintiffs, you don't know how much their to get the money back to them, right? Two parts to that answer. That is one way to get the money back to them, but I think we do know how these contributions were determined. We know that it's determined based on a percentage allocation between the employer and the employee. That's what Ms. Bikley was told when she asked. We see that in practice with the Vision Services Plan in 2019. The overall cost goes down, and the proportional split stays the same, with the employer paying 95%, the employee paying 5%. So they did get the money back, effectively, in that scenario. And we also know that Sequoia itself, the defendant, tells employers the typical way to run this is to do a 90%-10% split. So why is, why, are the employers, they're not involved in this lawsuit, I assume? Employers are not involved in this lawsuit, no. Have they brought a separate lawsuit, do you know? Not to my knowledge. So is it, is it a little bit of an oddity that, you know, who, under your theory, that the entities that are really getting it socked to them is the employers, because if it's, say it's a 90-10 or an 80-20, you know, whenever the employers are letting somebody siphon off, you know, some of the money, that, most of that money is actually hitting the employers harder than the employees, because employers pay for most of the benefit, right? They're paying for 80%. So why, why are the employers not involved? I, I would take issue with the, the, they're bearing the brunt of it. I, I, you know, the financial circumstances of each of these individual workers and the company. Well, let's say you're driving, I mean, your simple economics is driving the cost so that now insurance is costing, you know, because, because they're getting a kickback, you know, I'm sure that's not a phrase anybody likes, but like, it's because they're getting a kickback instead of it costing $900, it's now costing $1,000. But 80% or 90% of that $900 or $1,000 is coming out of the employer's pocket. Employers have quite a bit of control, in theory. Like, they could say, you think employers are the ones that have a seat at the table that would say, we don't like the fact you're getting these kickbacks. It's, it's costing us, you know, any individual employee, it's not costing them very much money. But the employers have a substantial stake. I, I guess the reason I mention this is why are the employers not policing this if it's a real problem? This is my big question. I, I see. I'm into my rebuttal time. May I briefly? Yeah, they, we, we will give you plenty of time to, for rebuttals. Why don't you answer this question and then we'll hear from the Department of Labor. That sounds good. A couple of answers to that, Your Honor. The ERISA statute empowers both employers and employees to sue on behalf of the plan. The Real Interest Party is the plan and the statute gives standing, statutory standing for either the employer or the employees or the Department of Labor or another fiduciary to bring the case. The case would, in this case, a remedy would go, would be shared with, between the employers and the employees in proportion to their contributions. So the employers don't need to file a second separate lawsuit. They will, just like the, the employees here, they will benefit from this case and the, the money will be split proportionally. But for the standing analysis, it doesn't really... Don't ask about standing. I, I guess you're different. Okay. A dollar of injury is enough for standing. Whether the employer was injured a thousand dollars and the employer was injured only a dollar, standing still exists. Thank you. Okay. Thank you. We'll give you two minutes when you come back. I appreciate that, Your Honor. All right. Let's hear from the Secretary of Labor. Good morning, Your Honors. I am Jamie Bowers, representing the Secretary of Labor. The question before you today is whether employees can sue to enforce their ERISA rights when a fiduciary illegally retains their money. The district court wrongly held that they could not. I'd like to address the district court's major error with respect to redressability. It failed to recognize that a fiduciary's recovery of plaintiff's payments makes their injury likely to be redressed. Here, both the Windsor plaintiffs and the employer RingCentral make payments into the MIWA's trust fund. A portion of those payments fund the commissions and administrative fees that plaintiffs contend are illegal. What plaintiffs are seeking through this action is a refund of those payments. The department's technical release, 2011-04, provides important guidance to health plans upon receiving this type of refund. This guidance applies to any type of distribution from health insurers. The department's technical release explains that payments from the trust fund constitute plan assets. When plan assets are How does your position square with Glanton? This case is different from Glanton because the Glanton plaintiffs were not seeking a refund of the plan assets. What they were seeking was a change in their co-payments. And the contributions though, right? I mean, it wasn't just limited to co-payments. I thought it also included contributions. I think the parties differ on whether the Glanton plaintiffs were actually making contributions into the plan, but what... The case I'm looking at, this passage, right? It says plaintiffs claim that if their suit is successful, the plan's drug costs will decrease and that the plans might then reduce contributions or co-payments. So why does that case not involve contributions similar to this? So, I mean, contributions, seeking a lowering of contributions or co-payments, that's the same function. That's a settler function. And that's what the Glanton plaintiffs were seeking. They were seeking for their employer to do something unfettered by fiduciary constraints, voluntarily changing co-payments or contributions. But here, what the Windsor plaintiffs are seeking is a refund of plan assets that their fiduciary holds. And that's what makes this case redressable. The fact that RingCentral, as a fiduciary, has that obligation to make participants whole. Well, they have a fiduciary obligation. I mean, one thing I found interesting in your brief, the secretary keeps using the phrase, it's substantially likely or it's likely that this would be refunded. I read something into that language. It seems significant. And so I take it, it's not a requirement. It just seems it's substantially likely in your view? Right. I mean, I believe the Ninth Circuit standard for redressability is that it be likely that that plaintiff's injury be redressed, not a certainty. And I think that's the case, Renee versus Duncan cited in our brief. But I believe that the circumstances in this case where the plan assets are refunded to the fiduciary and you have participants that have been harmed, a plaintiff's injury is likely to be redressed because the fiduciary will allocate their money back to the participants. What happens going forward if Sequoia, a company like Sequoia can't charge the way, that's how they make their money, right? Like they're a middle, they're essentially a middleman and they make their money by getting, maybe I shouldn't call it a kickback, that sounds bad, but whatever. They get a commission from the insurance companies. And that seems like a little odd relationship. Seems like you could create some perverse incentives there. But if that suddenly was effectively made illegal through litigation like this and assuming that Sequoia and companies like them serve a useful purpose, then they're going to have to get paid somehow. How will they get paid? That's a good question, your honor. Well, I think the answer to that is that they'll get paid directly by the employers, like when they probably will have to go out and pay them directly, probably, right? They can't get paid anymore by the, and they can't eat nothing. So they'll have to get paid. And so that's, that's what I'm trying to figure out. Like, if that's the case, if the six, say the 6% comes, goes the circuitous route and goes through the, then the 6% will just come out of the employer's pockets more directly. It's not going to come from the employees. They're, you know, 20 to 10%. So I kind of could, I'm trying to figure out if that's, if that's what you think would happen, why couldn't, why is it clear at all that this money should be returned to anybody but the employer if that's who would have paid it in any event, they would have been the ones paying a fee to Sequoia to provide this benefit instead of paying the fee indirectly through a commission. Well, the issue here is that the way Sequoia's compensation is structured is it's coming from the plan assets and that's money set aside by the employer and by the employees to be exclusively used for the benefit of the employees. And I think the Ninth Circuit case, Santa Mena recognizes that there is a lawful way to structure that compensation and that compensation must be the compensation isn't properly disclosed to the employers. And it is, it's discretionary because Sequoia has the ability to. I guess I'm trying to get at why, why, why do we have any reason to think that any of this money would ever, would have ever come from anybody but the employer? And if that's the case, then you have an injury problem. And if that's the case, then why would it make any sense to give it back to anybody but the employer? And if that's the case, you have a redistributability problem. It's just not, because in, in, in another world where they hadn't done this, it seems to me it would have come from the employer. Well, when plan assets are refunded, they cannot inure to the benefit of the employer. They're set aside for the benefit, benefit of participants. So when they get refunded, RingCentral can't just keep the refund. Right, but what makes it, what makes this difficult is that, is that the employer is paying so much of the benefit, right? Like they're paying, you see actually in some ways even harder than, than these cases that involve a defined benefit plan, because the employer is paying 80, 90 percent of the benefit. So that leaves a lot of room for the employer to, to decide, you know, I'll, I'll pay, what I'll do, because I can't do it this one way, is I'll pay, instead of 90 percent, I'll pay 85 percent, and then I'll pay the other 5 percent will go towards actually the, the fee that these middle people provide. So are you saying that, are you asking why the plan sponsor cannot just change the allocation amount? Well, they can, right? We know that. They can. And if they, if they can do that, and so, and if Sequoia didn't have an arrangement like this, if they would have to be, if they would have to be funded some other way, they're not going to work for free, then why wouldn't, why wouldn't it make sense to just expect that that would come from the And what causes me to think that probably the case is that the employers seem to be somewhat ambivalent about this arrangement. Like they, and likely they're ambivalent because they figure if we don't pay it this way, we'll have to pay it some other way. Well, with respect to your question earlier about why aren't the employers bringing this action, it's because the money that they're paying is intended for employees' benefit. It's already earmarked for benefits. So that, that is money that is supposed to go entirely towards providing employees' benefits. It's not really the employer's money anymore once it gets contributed into the plan. If they could pay, you know, 3% less towards that, right? That's, that's a lot of money. That's, you know, if they, if they could shave money off of what it costs them for these benefits. So if their 80% portion or their 90% portion went down because they could, I, yeah, I'm just trying to figure out, you know, to me that all, all this, the economics of this just makes it seem like it's sort of just a way of looking at economically the concern that, like, that it's not clear at all that the, that the, that the injury here, that they ever experienced a real injury, the employees, because their portion that they pay is so small compared to what the employers pay. Or that it would necessarily, I think, I think your colleague at your table is saying it necessarily would have to be paid to the employees, but it's given that the employers paid so much to them, so much of it, it's unclear to me that they would, that that money would necessarily need to go back to the employees, and I'm not hearing why exactly. Your Honor, you're correct that the employer is paying the lion's share of the contributions into the plan, but defendants are the ones that set the entire pool of contributions that both the employer and the employees have to pay, and that pool includes the commissions and includes the administrative fees. Defendants are the ones that are negotiating those amounts. So no matter where Ring Central allocates the, allocates the split, whether it's 80 percent, 70 percent, or a higher amount, plaintiffs are still going to be paying into those commissions and administrative fees. So they're still injured no matter where Ring Central allocates the difference between, between itself and its employees. And even... I think we've, this three minutes turned into nine, so we like to under-promise and over-deliver here, so we'll, we'll ask you to take a seat, and we'll, we'll hear from Sequoia. Thank you, Your Honors. Thank you. Good morning, Your Honors. My name is Mark Nielsen, and I'm representing Sequoia and the defendants' appellees in this matter, and may it please the Court, I would like to begin with just a couple of preliminary points before getting into, I think, the specific issues that were raised by my colleagues during the last round. First of all, I would like to point out what there is that either plaintiffs admit or they concede to the District Court below. First, they admit that all of the health and welfare benefits in this case were fully insured. They also admit that Sequoia paid all of the premiums in full and on time permissible, or permissibly consistent with the trust agreement to the insurance companies. They also admit that the trust benefit program, or I'm sorry, the tech benefits program in which the Ring Central Plan was a participant, was at all times financially sound. They also admit that all of their benefit claims have been paid. We had that concession from the plaintiffs this morning. And they also admit that to the extent there is Article III injury, and that they prevail on the merits, that any recovery in this case would not be needed to pay benefits or to satisfy any other liabilities. With that being said, I'd like to then move into some of the comments that were made during the earlier round, which I have to admit, Your Honors, and with all due respect to my colleagues, the representations that were made here today are not reflective in the record below. Among other things, we kept hearing from the plaintiffs this morning that there has been a misappropriation of trust assets, that there was a siphoning off of trust assets. That is not the case. And there has never been an allegation below that trust assets were misappropriated. What the allegation that the plaintiffs are making is that the trust assets were used to pay insurance commissions, and then third-party insurance companies paid those commissions to Sequoia. That is not a siphoning of planned assets. That is not a pocketing of planned assets. Now, the plaintiffs in the Department of Labor may argue that those commissions are planned assets, but I want to make very clear here that there has never been an allegation that money was diverted. The commissions are not directly planned assets. I guess what they're saying is the fees that were paid out of the fund, those were planned assets, and those fees were too high. I take it the fee part of this would be planned assets. Your Honor, they certainly do state that the administrative fees, they do make the allegation that the administrative fees that were charged by the insurance companies were too high. And from there, they claim that they have been injured. But to go to the question that was asked earlier about how do those fees translate into an injury here, the plaintiffs don't have a response. Their allegation in their opening brief is that they pay a pro share of the overall premium rate. And we were told this morning by the Plaintiffs' Counsel that, and I believe that this is a direct quote, we know how employee contributions are determined. That is not accurate. Paragraph 15 of the amended complaint, which we quote multiple times in our brief, has a statement from Ring Central obtained by the plaintiffs which says that Ring Central does not have a formula for determining what the employee contribution rate is and that there are no specific factors that they utilize to determine. Rather, Ring Central said that there are, and I quote, various factors and discussions, end quote, that go into determining the employee contribution rate. That defeats any argument that the plaintiffs have that they can somehow allege that the employee contribution rate is tied to the overall premium in some meaningful or even in any way whatsoever. And they've never responded to that point about that there is no formula. At best, they say that because Ring Central, or I'm sorry, they say that because the tech benefits program requires Ring Central to pay 50 percent of family contribution rates or 75 percent of the employee contribution rate, that that somehow proves that employee contribution rates are tied to overall premium rates. But as the district court found, and as I don't think there's any dispute, that is a Ring Central in its, in each of the years at issue, 2016 to 2019, offered zero dollar premium plans to its employees, meaning that Ring Central paid 100 percent of the costs. If, in fact, the plaintiffs were correct that Sequoia dictates what the employee contribution rate is and that is only a percentage of what the overall rate is, then Ring Central would not have either been allowed to or would not have offered to pay substantially in excess of the tech benefits. It sounds to me like you're speaking in a way that puts you in the Glanton case. Is that what you're doing? Well, certainly, Your Honor, we do think that Glanton is dispositive. And if I could... That's my next question, is they say Glanton isn't dispositive because it wasn't, it did not involve the employer and there was no trust and there was no refund of plan assets possible. So that's, that's their distinguishment of Glanton. So can you respond to that? Absolutely, Your Honor. And we did respond to that in our, in our opening brief. And I will tell you that the statement that was made today, which the plaintiff said was the key distinction, was exactly what Your Honor just raised, that there was no employer money involved. That is false. As the Ninth Circuit stated in the Glanton case, in its own opinion, that there were employee co-payments and contributions. But even looking at the briefing in the Glanton case, which we do cite in our opening brief, and I'll quote from the plaintiff's brief, it says, and I quote, the greater the cost of prescription drugs as a result of defendant's conduct, which is the defendant here was to PBM, the more the plan needs to be funded. The more the plan needs to be funded, the greater the direct employee contributions, whether in the form of co-payments, co-insurance, deductibles, or in the form of monthly contributions to the plan. There's no basis for the plaintiff to make the argument that there were no employer contributions to this plan or at issue in Glanton. There were. And the Court can look at the Glanton or the Ninth Circuit's decision to verify that, but the plaintiff's briefing also verifies that point. As to the notion that the commissions that were paid to Sequoia in this case are planned to be paid on assets, that is a legal conclusion that the plaintiffs have made. They cite no authority for that proposition. This is a standard business. And, Judge Van Dyke, I think you raised this issue about the commissions, what they call kickbacks. These are insurance commissions. This is a standard business transaction that happens in the health insurance industry. Can I ask you about that? Is there another arrangement that gets used in other instances? Like, how else does Sequoia – my understanding is Sequoia is sort of a middle man here between – they go to a company, I assume, and say, hey, we'll handle your benefits for you, right? And they – and then we'll go out and we'll find insurance companies and we'll negotiate the best rate we can for you and all of that. Is that kind of generally what Sequoia does? Yes, certainly, Your Honor. Sequoia does go out and it does identify insurance companies. I don't believe that it negotiates the premium rate. Those are other types of underwriting. But certainly, Sequoia is the entity that goes out, identifies insurers, provides the information to insurers for the insurer to make its decision. They then provide the premium rates to employers. Employers then elect the coverage, if they so choose, and affirm what the premium rate will be. Employers decide how much they're going to split between them paying versus employees paying and all that. And then Sequoia, the way Sequoia makes its money, it sounds like, at least in this instance, is it gets a commission from the insurance company. Is there other financial arrangements where Sequoia – is there financial arrangements where Sequoia gets paid instead by the – directly by the employer to provide this service? You know, instead of taking 6 percent of the money that's paid to Anthem, we'll pay you $2 million to provide this service for us? Certainly, Your Honor. I don't know whether Sequoia has that type of arrangement. I think also, as discussed in some detail in the Chamber of Commerce brief, amicus brief in this case, that the commission arrangement here with the commissions being paid by third-party insurance companies as a percentage of overall premium, that is the standard brokerage arrangement that are utilized by – That's normally done. Okay. Yes. And is it as a competitive – like there's other companies other than Sequoia? Yes, Your Honor. I assume that, you know, that's what sets the – Sequoia is like can't charge whatever it wants as far as it can say, give me – I want 20, 30, 40, 50 percent because somebody will – insurance – it'll drive the insurance rate up. That'll cause the employer to go somewhere else to hire somebody else. I think that's exactly right, Your Honor. And I would also say that insurance companies, I don't think, would be willing to pay insurance premiums or commission payments that are above what the market rate would be. They would simply say, what you're proposing, Sequoia, as a rate is too high. There's no way we're going to pay that. At best, we'll pay what is standard market. But I think, Your Honor, you also raise a good point here, which is that the arrangement that is at issue here is a year-to-year arrangement. This is not some type of locked-in arrangement that RingCentral has engaged Sequoia and is subject to this particular arrangement for eternity. It is a year-to-year arrangement that Sequoia can elect to opt in or opt out of. And as we noted in our brief, and as the plaintiffs acknowledge in the amended complaint in their first footnote, RingCentral is no longer a participant in the RingCentral or, I'm sorry, in the tech benefits program, but it does continue to utilize Sequoia as its broker, which I think identifies that this is an arrangement that is, you know, renegotiated every year, depending on what the economics are, both for Sequoia as well as for RingCentral. Can I ask you about the interaction of this case with the Thole case? Because the district court is said this was a defined, you know, pension plan. That was obviously just sort of factually a little off. But why do you think this case falls within Thole? Thank you, Your Honor. I believe that the district court there said that this was a defined benefit plan. It didn't refer to it as a defined benefit pension plan, which is what the plaintiffs and the department want to argue. And I think that the court's analogy of this plan to a defined benefit plan was correct. If you read Thole and Justice Kavanaugh's opinion as to what is a defined benefit plan versus a defined contribution plan, this arrangement fits much more square — I should say it fits squarely as a defined benefit plan. It provides a fixed level of benefits. Participant goes to a hospital or goes to see a provider. The summary plan description tells exactly what the copay, what the deductible will be. It will identify what the percentage of the provider's benefit will be paid. And the plaintiff's ability to utilize those benefits is — will continue, regardless of how well the plan is managed or regardless of the health experience. Do you think the Fourth Circuit's decision in Peters is distinguishable or just wrong? I think that the Fourth Circuit's opinion in Peters is — first of all, I think it is wrong. I don't think it can be reconciled with Thole. And I think the fact that the court did not, that the Fourth Circuit there did not even address Thole, even though it had been briefed by both parties as being a relevant case, indicates that it is a case that certainly is not worthy of persuasion. But I think it is factually wrong. Is it distinguishable factually from this case? Well, I would say that one of the key things there in Thole — or, I'm sorry, in the Peters case is its holding about Article III standing, that you could have Article III standing even without a financial injury. That was pure dicta, because the court had previously found that the plaintiff did, in fact, suffer a financial injury, which there is no dispute would, in fact, be a recognizable Article III injury. That was a defined contributions plan. So if the pool, if the pot of money changes, it's going to affect the recipient. And that's quite different from a defined benefits plan. I'm sorry, Your Honor, are you referring to in the Peters case? Yes. Peters was a health case. It wasn't a contributions case. It was not. The issue in the Peters case was that there — that it was alleged that Aetna was basically charging an undisclosed amount that was being paid by plans for the type of health coverage that was being provided. It was not a defined contribution or any type of pension plan. I got it. And unless there's other questions that Your Honor has, I would — It appears not. Thank you, Mr. Nielsen. Thank you very much, Your Honors. Appreciate it. Thank you, Your Honors. Two points on rebuttal. I'd like to start with Glanton, and then I'd like to address your comments, Judge Van Dyke, about the economic situation that's going on here. So to begin with Glanton, if you look at Glanton, Glanton in its holding says, other circuits agree with our holding here. And the very first case that Glanton cites is the Second Circuit's opinion in the Central States case. Central States holds and recognizes exactly the distinction I'm making here. Central States says, if participants pay a copay at the point of sale and that's it, then this money, the spread, doesn't affect them. But if they pay coinsurance, if they contribute to the pot, then it does. And in that latter situation, the participants would have standing. Glanton is citing that as support for its holding. If you read Glanton the way my friend reads it, Central States makes no sense. This Court would have had to distinguish Central States or say Central States is wrong because Central States says when the participants contribute to the fund, the participants have standing. You can't reconcile Glanton with that if you read it the way my friend reads it. Second point, Judge Van Dyke, on your concerns about the economics. The issue here isn't the mechanism in which the payment is extracted. There will be some sort of a payment. The issue here is how much, how is that payment determined? The fee that is paid to Sequoia, the kickback, the commission, whatever you want to call it, is determined by Sequoia. Sequoia unilaterally sets that amount when it is negotiating with the insurance companies. And this Court's opinion in Santimento says you can't do it that way. That's not the lawful way to structure it. I asked about whether it's a marketplace, right? Like if Sequoia is operating in a marketplace, that's like saying, you know, Wrigley unilaterally sets the amount for the gum you're buying. But Wrigley's, you know, competing with Trident. The structure that ERISA sets up is for the fee that Sequoia gets paid to be negotiated at arm's length with some other fiduciary. I'm out of time. Can I, can I finish? With some other fiduciary who's looking out for the participants' best interests. Typically, that is the employer where there'll be an agreement between the employer and the service provider that, as Santimento says, will set a definitively calculable non-discretionary fee paid to the service provider. That's one follow up. So how how would you, you know, real quick, how would you set it up and would be legal in your view? There's a variety of ways you could do it, Judge. I wouldn't purport to say there's only one. But one way to set it up would be to do what Santimento says, to have a separate agreement between the planned level fiduciaries and Sequoia that would say you are going to be paid X fee. X fee has to be definitively calculable and not subject to Sequoia's discretion. Here, Sequoia has discretion to determine, is it 6 percent? Is it 5 percent? Is it 8 percent? That amount's not subject to an arm's length negotiation between the planned fiduciaries and Sequoia. And that is the market inefficiency that they're taking advantage of here. That's why ERISA requires that there be some independent planned level fiduciary negotiating that fee. That was helpful. Thank you. You're welcome. Okay. Thank you. This matter was well briefed and argued by both sides. The court thanks both sides and this matter is submitted.
judges: BRESS, VANDYKE, Restani